PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* HIPÓLITO CUEVAS COLLAZO, Defendant and Appellant.

No. 7327. Argued February 1, 1939.—Decided February 15, 1939.

*Carlos D. Vázquez* and *Virgilio Brunet,* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Justice Travieso delivered the opinion of the Court.

Hipólito Cuevas Collazo was accused of an alleged violation of Section 1 of Act No. 26 of April 26, 1934 (Laws of 1934, p. 278). The facts proven and accepted by the district attorney and the defense are as follows:

From the month of January, 1936, the accused, a merchant of retail provisions and owner of a grocery store in Santurce established and carried on commercial relations with the firm "Nestle's Milk Products, Inc.", which gave him credit up to $150. On July 7, 1937, the account of the accused showed a balance of $101.55 in favor of the Nestle Company. On July 10, 1937, the accused gave the salesman of said company a check for $43.25 to be credited to his account for merchandise delivered. When he gave the check to said salesman the accused told him that he did not have sufficient funds in the bank to cover it and asked him to wait a few days while he got some funds. The check was presented twice at the bank and refused for lack of funds. After having been notified that the check had not been cashed, the accused made various payments in cash, to credit to his current account, which payments were accepted by the creditor company.

In testifying in his own behalf the accused said: "I told him that I was giving him that check but that I expected to collect sufficient money, as I am paid weekly; to present the check within two or three days so that I would have time to deposit sufficient funds in the bank;" that he did not receive anything in exchange for the check, neither merchandise nor money; that when Mr. García came to see him with the check he gave him $15 and informed him "that he had not received the money that he expected but that nevertheless from money

previously received he had $15 which he was going to give him;'' that García accepted the money and did not give him a receipt nor did he return the check to him; that later the collecting agent of the Nestle came and he gave him $5 in July, $6.30 on August 9th and $2.10 on August 16th to be credited to his account; that after August 16th he was not able to continue making payments because an attachment was levied by another creditor; that when García took the check with him he knew that he could not present it because there were no funds. The testimony of the accused is fully corroborated by the witnesses for the prosecution. There is, therefore, no controversy in regard to the facts.

Found guilty and condemned to pay a fine of $87 or the consequent jail term, the accused appealed. In his brief the accused alleges that the court erred in weighing the evidence since it does not appear from it that the accused has committed any public offense.

Section 1 of Act No. 26 of April 26, 1934, for violating which the appellant is accused, reads as follows:

''Section 1.—Any person who, *for the purpose of defrauding another,* makes, extends, endorses, or delivers a check, draft, letter of credit, or order to pay money against any bank or other depositary, knowing at the time of doing so that the maker or drawer has not sufficient funds or credit in said bank or depositary for the total payment of the check, draft, letter of credit, or order upon the presentation thereof, shall be guilty of a misdemeanor and upon conviction, shall be punished by a fine that shall not be less than twice the amount of the said check, draft, letter of credit or order, or by imprisonment in jail for one day for each dollar or fraction thereof he fails to pay, or by both penalties, in the discretion of the court.''

As can be seen from the words in italics, the statute in this jurisdiction makes it an essential element or requisite of the offense that the making, endorsing or delivering of the check be made with the intent to defraud another person. The complainant understood this himself when he expressly

stated in his complaint that the check had been issued "with the intent to defraud Nestle's Milk Products, Inc." Without that allegation of the intent to defraud the complaint would have been insufficient and the lower court would have been bound to sustain the demurrer filed against it.

Does the evidence sustain the allegation of the intent to defraud that the accused had when making the check in question? The answer must be in the negative, since we cannot see how it can be sustained with success that such intent existed when the evidence shows that at the moment of delivering the check the maker warned his creditor that he did not have sufficient funds to cover the check at present- ment and begged him to wait until he could deposit the neces- sary funds.

The district attorney argues that in the present case the intent to defraud was proven by the fact that the accused even though he had been notified that payment had been refused, did not recover the check within the time stipulated by law. To sustain his argument he cites Sections 2, 4 and 5 of said Act No. 26 of 1934, which read as follows:

"Section 2.—To make, extend, endorse, or deliver a check, draft, or order the payment of which is refused by the drawee for insuf- ficiency of funds or lack of credit, shall constitute *prima facie* evi- dence of the knowledge of the drawer or endorser of the insufficiency of the funds or of the lack of credit.

\* \* \* \* \* \* \*

"Section 4.—No person shall be punished under this Act unless it is proved to the satisfaction of the court that the holder of the check, draft, letter of credit, or order, or his agent, has personally notified the drawer or endorser to pay to the holder or to his agent at the address to be specified on the notice, the amount of the check, draft, letter of credit, or order within a term of not less than ten (10) days, if the drawer or endorser to whom the notice is directed resides in the locality of the holder, and not less than fifteen (15) days if he resides in another municipality of the island. Said term shall be computed from the date of the notice to the drawer or en- dorser of the unpaid draft, check, letter of credit, or order.

"Section 5.—The failure of the person who drew, signed, endorsed, or delivered said check, draft, letter of credit, or order, to make payment after said notice, shall be *prima facie* evidence of the intent to defraud."

We do not agree with the interpretation which the prosecuting attorney gives to the legal provisions which we have just copied. The clear and evident purpose of Section 4, supra, is to provide a proceeding to prove *a posteriori*, that is, by subsequent facts, the intention or purpose that the maker of a check without funds had in mind when he issued and delivered it to another person. As the intent or purpose with which an act is done is a subjective function and as such impossible to prove objectively, the legislator found it necessary to set forth rules of evidence in view of which the judge can make deductions or reach conclusions against the accused, basing them on the latter's conduct or statements when he issued the check as well as after having been notified of the fact that the check had been rejected. In this way, according to Section 2, supra, when a check is made and delivered and the drawee refuses to pay it for lack of funds, from these facts the presumption *juris tantum* arises that the drawer of the check knew at the time he made it that it would not be paid. To protect those persons who have issued a check believing in good faith that they had sufficient funds for its payment, the act (Section 4, supra) gives the drawer a term of not less than ten days, from the date on which he is notified of the non-payment, to pay the amount of the check. And if the drawer allows the term to run without recovering the check, then the revocable presumption shall arise against him that when he issued the check he intended to defraud his creditor (Section 5, supra).

When A issues a check and delivers it to B, the former is really promising and representing to the latter that his order to pay will be honored by the drawee with whom he has sufficient funds or credit. This is the reason why the act provides that the mere fact of issuing and delivering a

check and the rejection of the same by the drawer shall constitute *prima facie* evidence that the drawer had knowledge of his lack of funds or credit (Section 2, supra).

In our opinion the rules of evidence that we are discussing are not applicable to a case such as the present in which at the moment of delivering the check to his creditor the drawer informs him that he does not have sufficient funds nor credit so that the check may be paid upon presentation and begs him not to present it until he has had time to deposit the necessary funds for its payment. How is it possible to presume the existence of an intent to defraud at the moment of delivering a check when the evidence shows that the person who received it could in no manner be defrauded since he was expressly informed by the drawer himself that the check would not be paid for lack of funds?

Fraud, synonymous with deceit, consists in a false representation, by words or by acts, of material facts, by which a reasonably discreet and confident person is induced to act to his own prejudice; or in the supression of material facts which a person is legally bound to reveal to another. See: 1 Story Equity Jur. sec. 186, and C. 6; Bouvier's Law Dictionary, vol. 1, p. 843.

In the present case there was no intent or purpose to defraud. The accused, when delivering the check to the agent of his creditor, revealed to the former the fact that he did not have sufficient funds for the payment of such check. No fraud was committed nor could any have been committed against the creditor company because it accepted the check knowing that there were no funds in the bank for its payment and that payment would be made when and if it would be possible for the drawer to deposit the funds to cover it. The creditor company has not suffered any damage whatsoever as a consequence of the drawing of the check, since it was issued to be credited to a pre-existent debt and not in payment of merchandise bought when it was issued.

The case of *State* v. *Avery*, 23 A.L.R. 453, on which the prosecuting attorney bases his theory is not in our opinion applicable to the present case. The Kansas statute punishes as a violation the mere fact of delivering to another person a check when the person who delivers it knows that he does not have sufficient funds for its payment. Avery was accused of having given a check not having sufficient funds and presented a motion for the dismissal of the complaint for the reason that it did not allege sufficient facts to constitute a public offense. From the opinion in said case we copy what follows:

"The defendant contends the criterion of guilt in criminal law is wrongful intent, and the statute does not require criminal intent in order to constitute the felony denounced. The statement is entirely too broad. The worthless check must be wilfully drawn, knowing at the time there are no funds on deposit to meet it. Beyond that, the legislature may, for protection of the public interest, require persons to act at their peril, and may punish the doing of a forbidden act without regard to the knowledge, intention, motive, or moral turpitude of the doer. There is no constitutional objection to such legislation, the necessity for which the legislature is authorized to determine. Whether or not the legislature has enacted such a statute is a matter of interpretation."

In interpreting the statute in question the Supreme Court of Kansas stated as follows:

"The defendant contends the offense of giving a worthless check is related to the false token and false pretense group of crimes, and consequently, in order to constitute a crime, the check must be given with intent to defraud, and fraud must be accomplished by procuring money or other valuable thing. That the legislature was not adding to the list of punishable deceits and frauds is manifest from the interpretative section of the statute, and from the fact the legislature at the same session passed the Bogus Check Act. The purpose of the statute was to discourage overdraft and resulting bad banking, to stop the practice of 'check kiting', and generally to avert the mischief to trade, commerce, and banking which the circulation of worthless checks inflicts. Although the statute tends to suppress fraud

·committed by the worthless check method, the evils referred to are all quite distinct from those consequent on fraud, and the statute is to be regarded as creating a new and distinct offense.

\*  \*  \*  \*  \*  \*  \*

"In this instance it seems clear that fraudulent intent was purposely omitted from the enumeration of elements of the crime."

In the case of *Commonwealth* v. *McCall*, 186 Ky. 301, 217 S. W. 109, the Supreme Court of Kentucky, interpreting a similar statute to ours, said:

"This section creates a new and distinct offense, the commission of which is accomplished by giving a check *with the intent to defraud* on a bank in which the maker knows he has not sufficient funds to pay the check; and it is not essential to constitute an offense under this section that any false representation, statement, or pretense should be made by the maker of the check concerning the state of his account in the bank, on which the check is given, or in connection with the transaction. No questions need be asked by the person to whom the check is given or information volunteered by the person giving the check. The mere giving of such a check *with the intent to defraud* will constitute the offense, and the intent to defraud will be present whenever money, property, or other thing of value is parted with by the person to whom the check is given."

The evident purpose of the Kansas statute was to prosecute and terminate the bad practice of issuing checks without funds even when the drawer had no intention to deceive or defraud the person in whose name he issues the check. That is why the legislator eliminated the "intent to defraud" from the definition of the offense. The purpose of the Kentucky statute, as well as ours, is to prosecute and punish the making of checks without funds as a means of defrauding or deceiving the person who receives it, obtaining from him money or property.

The "intent to defraud" forms a part of and is an essential element of the offense which is defined and punished by Section 1 of Act No. 26, supra. And being an essential element of the offense it should be alleged in the complaint and

294

sustained by the evidence. See: *State* v. *Alphonse*, 154 La. 950, 35 A.L.R. 380; *McBride* v. *State*, (Miss.) 104 So. 454, 43 A.L.R. 49.

The cases examined by us hold that when in the definition of the offense of giving a check without funds the requisite of the "intent to defraud" is included, to gist of the offense is the knowledge of the drawer of the check at the moment of issuing it that he has no funds and the intent to defraud. *Re Scott*, 85 Cal. App. 170, 259 P. 101; *People* v. *Radich*, 111 Cal. App. 779, 294 P. 1; *Re Leuschen*, 134 Cal. App. 246, 25 P. (2d.) 243; 95 A.L.R. 489.

The presumptions established by sections 2 and 5 of our statute, supra, were controverted by the fact proven and admitted that the accused informed the agent of the Nestle Company when he delivered the check that he did not have sufficient funds. And as the allegation of the "intent to defraud" has not been sustained by any independent evidence, the conviction of the accused cannot be upheld. *Padgett* v. *State*, 24 Ala. App. 133, 131 So. 3 (95 A.L.R. 490); *Turner* v. *Brenner*, 121 S. E. 510, 35 A.L.R. 380; *People ex rel. Indig* v. *Kapitofsky*, 144 Misc. (N. Y.) 543, 258 N.Y.S. 861; 95 A.L.R. 491 and note VIII on page 494.

For the above reasons the judgment appealed from should be reversed and the accused acquitted.